**EAST HILLS CONDOMINIUMS LIMITED PARTNERSHIP,**
Respondent,

v.

**TRI–LAKES ESCROW, INCORPORATED, a/k/a and d/b/a Tri–Lakes Title Company, Appellant.**

No. SD 28892.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 23, 2009.

Motion for Rehearing or Transfer Denied March 18, 2009.

Application for Transfer Denied May 5, 2009.

Richard L. Schnake, Neale & Newman, LLP, Springfield, MO, for Appellant.

Patrick R. Miller, DeZube Miller LLC, Overland Park, KS, for Respondent.

ROBERT S. BARNEY, Judge.

Appellant Tri–Lakes Escrow, Incorporated, a/k/a and d/b/a TriLakes Title Company ("Appellant") appeals the Judgment of the trial court entered in favor of East

Hills Condominiums Limited Partnership ("Respondent"). In its Judgment, the trial court found the parties had entered into a written agreement as well as "an express trust for the distribution of funds;" Appellant breached the parties' agreement; and Respondent was damaged in the amount of $501,305.00. Appellant asserts three points relied on challenging the trial court's application of the ten-year statute of limitations set out in section 516.110(1) as well as the inclusion of certain items in the amount of damages awarded.[1]

The record reveals that in early 1993 Respondent decided to create a condominium development in Branson, Missouri, known as the Foothills which was planned to have 136 condominium units located in six buildings. Respondent hired Killian Construction ("Killian") to be the general contractor on the Foothills project. Respondent secured financing through Great Southern Savings Bank ("Great Southern"), and engaged Appellant to serve as the escrow agent.

On August 18, 1993, the parties entered into the "FOOTHILLS CONDOS–EAST HILLS DEVELOPMENT ESCROW DISBURSAL CONTRACT" ("the Agreement"). The Agreement purported to be a four-way contract between Respondent as "Owner," Killian as "Contractor," Great Southern as "Lender," and Appellant as "Agent."[2] The Agreement provided "for disbursals of the proceeds of that certain loan ... in the amount of $6,779,373.00 to be used in the construction of the ..." Foothills development. Article I of the Agreement set out the responsibilities of each party. Killian "agree[d] to furnish all labor, material, supplies and equipment required for the completion of the construction of the project...." Great Southern "agree[d] to furnish the proceeds of the

1. All statutory references are to RSMo 2000.

2. The agreement was signed by all parties with the exception of Great Southern.

construction loan to [Appellant] for payment to [Killian]. . . ." Respondent "agree[d] to furnish all funds in excess of the proceeds of the construction loan to [Appellant] for payment to [Killian]. . . ." The Agreement further provided Appellant "shall make all payments on behalf of [Respondent] and [Great Southern] to [Killian] in the manner and at such times and places hereinbelow set forth." Article II A of the Agreement, which detailed "Payments," set out the following:

> Before payment shall be due . . . [Killian] shall submit to [Appellant] individual 'Contractor's Request for Payment Certificate', . . . executed by or on behalf of each general contractor, subcontractor, workman or materialman upon whose behalf payment is requested, together with the certificate of the Architect certifying the amount due upon said application for payment.

> Thereafter, [Appellant] shall provide [Killian] with individual 'Waiver of Lien,' for each general contractor, subcontractor, workman or materialman, in substantial form as that shown on Exhibit 'D', attached hereto and made a part hereof . . . which Waiver upon due execution and presentation to [Appellant] shall be paid.

Further, Article II B of the Agreement stated:

> Upon completion of each individual contractors', subcontractors', workman's or materialmen's portion of the Project, [Killian] shall furnish [Appellant] . . . a Final Request therefor[e], and shall be entitled to receive, within ten (10) days thereafter, the balance of funds certified therein.

Thereafter, [Appellant] shall provide [Killian] with individual 'Waiver of Lien', in substantial form as that shown in Exhibit 'D,' attached hereto and made a part hereof . . . which Waiver upon due execution and presentation to [Appellant] shall be paid.

By early January of 1994, problems had arisen on the Foothills project such that Killian "pull[ed] off" the project on January 10, 1994, and ceased construction. Thereafter, Respondent was notified by numerous subcontractors and vendors that they had not been paid for their work on the project although Appellant reported to Respondent that it had paid Killian.[3] When Respondent approached Appellant with its concerns, Appellant was unable to produce the required paperwork to prove its disbursements under the Agreement and to prove that it obtained lien waivers on all the disbursals.

On August 14, 2003, Respondent filed its "Petition" in which it asserted in Count I that Appellant had breached an express trust by "failing to properly account for money it held in trust for [Respondent] and failed to properly account for all payments relative to labor and materials . . . by obtaining validly executed Lien Waivers as provided in [the] Agreement" and in Count II that Appellant breached a contract "for the payment of money or property."

On October 30, 2003, Appellant filed a "Motion to Dismiss" Respondent's petition on the basis that Respondent's claims were essentially for breach of contract and were barred by the five-year statute of limitations set out in section 516.120.[4] This motion was overruled by the trial court.

---

3. Respondent recovered $100,000.00 from Killian in an earlier lawsuit and Killian also agreed to pay $75,000.00 toward one outstanding claim.

4. Appellant likewise raised the statute limitations issue in its Answer, in its motion for judgment at the close of Respondent's evidence, in closing argument at trial, and in its motion to set aside the judgment. The issue was overruled each time by the trial court.

The trial in this matter was held on August 27, 2007. At trial, Leora Zook–Piatt ("Ms. Zook–Piatt"), Appellant's "[s]enior construction disbursal officer," testified that a typical draw request on a construction project consisted of several documents as well as invoices. She stated each draw request had a cover sheet which had to be signed by the contractor, the property owner, the lender, and, if required, the project's architect. She stated that once the required signatures were obtained on the cover sheet, she reviewed the invoices and matched them up to the entries on the pay list. She related the invoices attached to the draw request always "must be equal to or greater than the amount" stated in the draw request. Once she matched up the invoices to the entries on the pay list Ms. Zook–Piatt prepared a "requisition certificate," which informed the lender of the amount of the request. If the lender approved the draw request, it then provided the funds, in most cases, directly to Appellant. The lender very rarely paid vendors and subcontractors directly. When funds were transferred from the lender to Appellant, they were held in an account by Appellant.

Ms. Zook–Piatt also testified she then "disburse[s] the checks accordingly and collect[s] lien waivers." She stated she "[a]ccumulate[s] the appropriate lien waivers that's going to equal the amount that is being disbursed" prior to issuing the checks to those listed on the pay list. She stated that even when she issued a reimbursement check to a contractor for work done by a subcontractor she was required to obtain a lien waiver from the subcontractor. She stated the lien waivers were important to protect the interests of the property owner and the lender so that they could avoid liens in the future as well

as double payments. She admitted that ultimately it was her obligation to obtain the lien waivers whether she did so when she disbursed the checks or at a later date.[5]

As for the documents relating to the Foothills project, Ms. Zook–Piatt stated Appellant was unable to produce all of its records for possible reconciliation and for use at trial. She stated that she placed all of the records in a box for a deposition relative to Respondent's earlier lawsuit against Killian, "and that's the last time [she] laid eyes" on the box. The only documentation she was able to recover was a summary sheet showing totals for construction draws and lien waivers which showed the totals submitted by Killian for itself and its subcontractors. Ms. Zook–Piatt also testified the summary showed that under her calculations Appellant disbursed $3,601,996.43 on the project to Killian and there were lien waivers totaling $3,872,770.92. Accordingly, it was her view that Appellant received lien waivers totaling about $271,000.00 more than it had paid out in draws, although Appellant could not produce the lien waivers themselves. Saliently, she stated she had no way of knowing if the money she paid to Killian was, in fact, used to pay the vendors and subcontractors on the Foothills project.

Michael Sawhill ("Mr. Sawhill"), president of Ben Brooks & Associates, one of Respondent's general partners, appeared as Respondent's representative at trial. He testified that problems arose with Killian's work and they terminated their business relationship on January 10, 1994. He stated that during the Foothills project Killian used its own subcontractors and vendors and Respondent did not deal with any of them directly. While trying to

5. Steve Babbitt ("Mr. Babbitt"), Appellant's president, testified that his employees were required to obtain lien waivers on each and every payment and they did not have the discretion to determine if a lien waiver was not required.

move the project forward under a new general contractor, he related that it came to his attention that some of the vendors and subcontractors had not been paid by Killian. He stated he "started getting a lot of calls" and there were "all kinds of vendors calling and subcontractors saying they hadn't been paid." He also related that "[t]he vendors got very concerned . . . as soon as [Killian] got terminated. They started scrambling, because they were concerned about payment to them . . . and if we wouldn't be able to fund their liabilities." He also stated that Respondent had "paid to the point the project was at under [the] contract with Killian and yet the people were saying they hadn't been paid." Mr. Sawhill likewise testified Respondent "very quickly [started] hearing from everybody" and he began requesting letters from those that had not been paid so that he could determine what was due.

Mr. Sawhill further set out that a week or so after he became aware of the non-payment issues he contacted Mr. Babbitt. Mr. Sawhill stated he "was real comfortable" that Appellant would have the lien waivers that could be matched up to the claims, invoices, and pay lists. He also stated Appellant did "not immediately" provide him with the documents he requested and after numerous days provided him with copies of some of the lien waivers with a tape attached showing a total, but no reconciliation of the account. Mr. Sawhill also related he went through the documents and was unable to match up the invoices, pay lists, and lien waivers such that he could not resolve any of the claims submitted by the unpaid vendors and subcontractors. He also testified that in relation to the Foothills project all disbursals were made by Appellant directly to Killian who submitted lien waivers to Appellant and that Killian asserted it had paid the subcontractors and vendors. Mr. Sawhill opined that it was possible that Killian lied about paying the vendors and contractors.

Mr. Babbitt, Appellant's President, testified he worked closely with Respondent to research the outstanding claims and negotiate settlement of many of those claims. He admitted there were mechanic's liens filed, but there were no lawsuits filed to perfect the liens. Mr. Babbitt stated that he did not "have any reason to dispute the numbers Mr. Sawhill came up with . . ." and related the numbers "might be off by 30 cents, you know, but I think I can live with that." Further, he stated he faced a similar situation with Killian on a previous project where Appellant paid Killian and Killian failed to pay the vendors and subcontractors.

On October 9, 2007, the trial court entered its Judgment which stated:

> The evidence establishes without dispute that representatives of [Respondent] and [Appellant] executed [the Agreement] . . . . pursuant to the Agreement, the parties entered into an express trust for the distribution of funds. [Appellant] was to distribute funds 'upon the obtaining of lien waivers' from various contractors, sub-contractors and materialmen.

> The evidence establishes that certain payments were made by [Appellant] without first obtaining lien waivers from various subcontractors and materialmen. [Appellant's] failure to obtain necessary lien waivers was a breach of the Agreement and resulted in damages to [Respondent] in an amount equal to $501,305.00.

This appeal followed.

Appellant's first point relied on maintains the trial court erred in entering judgment in favor of Respondent because Respondent's "claim for breach of express trust was barred by the statute of limitations. . . ." It asserts Respondent's "claim constituted one for breach of fiduciary duty, which is a tort governed by the five-

year limitation in [section] 516.120" and this matter was filed "more than five years after [the] cause of action accrued." As an alternative to Point I, Appellant's second point relied on asserts that

> [s]hould the Court conclude that the trial court's finding that [Appellant] breached an 'express trust' was wrong and that [Appellant] actually committed breach of contract, the trial court nevertheless erred by entering judgment against [Appellant], because [Respondent's] claim for breach of contract was barred by the statute of limitations, in that the escrow disbursal contract was not one for the payment of money within the meaning of the ten-year limitation in [section] 516.110(1), and therefore the claim is barred by the five-year limitation in [section] 516.120(1).

Appellant's first two points relied on are interrelated and we shall address them together.[6]

 The standard of review for a judge-tried case is governed by Rule 84.13(d), Missouri Court Rules (2008). The judgment of the trial court will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Gaydos v. Imhoff*, 245 S.W.3d 303, 306 (Mo.App.2008). " 'We must consider the evidence and all reasonable inferences in a light most favorable to the judgment, disregarding any evidence or inferences to the contrary.' " *Id.* (quoting *Pulley v. Sandgren*, 197 S.W.3d 162, 165 (Mo.App.2006)). " 'Although we give deference to the [trial] court's factual determinations, our review of any error in applying the law is *de novo*.' " *Id.* (emphasis added). "The question of which statute

of limitations applies is a question of law." *Chouteau Auto Mart, Inc. v. First Bank of Missouri*, 148 S.W.3d 17, 21 (Mo.App. 2004).

Here, Respondent's petition specifically alleged Appellant breached an express trust and breached the Agreement by failing to obtain lien waivers and properly disburse money. The petition goes on to state that "[a]s a direct and proximate result of [Appellant's] failure to properly account for the personal property in the form of funds placed into [Appellant's] hands for [Respondent], all pursuant to the ... Agreement, [Respondent] had been damaged...." In Respondent's Count II for "Breach of Contract for the Payment of Money or Property" Respondent asserted Appellant "made an express and written promise to pay money pursuant to [the Agreement] for the benefit of the subcontractors and material providers on the [Foothills project]" and that the Agreement, "[t]he [p]ayment [a]pplications and supporting documents represented the obligations for which [Appellant] undertook to ensure proper payment to the proper parties...." Respondent maintained Appellant then "breached the obligation to pay the vendors, subcontractors and suppliers by failing to ensure that the payments made were for the benefit of the subcontractors and suppliers ..." such that there was damage from non-payment. Further, Respondent asserted it had to negotiate with the vendors and subcontractors who had not received payment and had to pay out of pocket to settle those claims.

Throughout this litigation, Respondent has contended that its petition was timely brought pursuant to section 516.110(1).

---

**6.** We note neither of these points challenges the trial court's substantive determination that the Agreement was an "express trust for the distribution of funds" or the finding that there was "a breach of the Agreement [which]

resulted in damages to [Respondent]." The challenges in these points relied on relate strictly to the issue of which statutory section regarding the statute of limitations is applicable in the present matter.

Section 516.110(1) sets out that "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property" shall be commenced within ten years. Appellant, on the other hand, has asserted that Respondent's claims were more akin to a tort claim such as breach of fiduciary duty or a strict breach of contract claim—actions which have a five-year statute of limitations under section 516.120. Section 516.120 requires the following actions to be commenced "[w]ithin five years:"

(1) All actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110, and except upon judgments or decrees of a court of record, and except where a different time is herein limited;
* * *
(4) An action for taking, detaining or injuring any goods or chattels, including actions for the recovery of specific personal property, or for any other injury to the person or rights of another, not arising on contract and not herein otherwise enumerated....

■ On appeal, Appellant argues that the question before this Court in determining the proper statute of limitations is whether this was an equitable action, a tort action or one sounding in contract. It is our view that the claims in Respondent's petition were based on breach of the written Agreement signed by both parties and were neither tortious claims nor equitable claims. The stated causes of action were contractual in nature based on the wording in the petition.

"Missouri has two statutes of limitation relating generally to contract actions: sections 516.110(1) and 516.120...." *Hughes Development Co. v. Omega Realty Co.*, 951 S.W.2d 615, 616 (Mo. banc 1997). As stated in *Hughes*, 951 S.W.2d at 616, the differences in the application of section 516.110 and section 516.120 "have a hoary

tenure in Missouri law." "Despite nearly a century and a half of experience with these statutes of limitation, Missouri appellate courts have lurched unevenly from holding to holding, unable to craft a principled interpretation of the statutory language that could produce either consistency or predictability of application." *Id.* at 617. As a result of the various rulings in this area the court in *Hughes* found it was "fully justified in ignoring the precedent in favor of the statute itself:"

[s]ection 516.110(1) is not ambiguous if one reads it without concern for outcome. Taken at its plain meaning, section 516.110(1), the ten-year statute of limitations applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract. Section 516.110(1) imposes no requirement that the amount the defendant owes as a result of the written contract be determinable without resort to extrinsic evidence and neither shall we. This is the application of section 516.010(1), admittedly quite broad, that we adopt.

*Id.*

■ Here, the parties entered into a written Agreement whereby Appellant was charged with making "disbursals" "on behalf of [Respondent] and [Great Southern] to [Killian] in the manner and at such times and places hereinbelow set forth" in the Agreement. The Agreement clearly contained a promise on the part of Appellant to pay money on Respondent's behalf after it obtained a waiver of lien from each payee. The record shows Appellant then breached the Agreement by disbursing money without obtaining the required lien waivers. Respondent's petition sought judgment against Appellant as per the terms of the Agreement. In these circumstances, the ten-year statute of limitations in section 516.110 is applicable. *Hughes,*

951 S.W.2d at 617.[7] The trial court did not err in applying the ten-year statute of limitations to the present matter. Points I and II are denied.

As an alternative to Points I and II, Appellant's third point relied on maintains the $501,305.00 judgment entered against Appellant was not supported by the evidence. Specifically, Appellant asserts the $501,305.00 damages award "includes $29,938.00 for washers and dryers from General Electric that [Respondent] admitted were not lienable items, and on which no lien waiver would have issued" as well as "$26,715.38 for a payment to National Home Centers that National Home Centers' statement did not show was due."

We turn first to Appellant's contention that the damages award included an award for $29,938.00, which was paid by Respondent to General Electric for washers and dryers for the condominium complex at issue. Appellant argues that because washers and dryers are not the type of items which could be subject to a mechanic's lien this amount should have been excluded from the award because "the evidence does not support the trial court's judgment that [Appellant] should pay [Respondent] for them as a consequence of a failure to obtain lien waivers that [Mr. Sawhill] acknowledged would never have been given in the first place."

■■■ "When interpreting any contract, a court must follow the terms of the contract as written if those terms are plain, unequivocal, and clear." *Muilenburg, Inc. v. Cherokee Rose Design and Build, L.L.C.*, 250 S.W.3d 848, 853–54 (Mo.App. 2008). "Only if a contract is determined to be ambiguous will a court then look to parol evidence in order to determine the parties' intent." *Id.* Here, as already stated, the cause of action tried to the court was based on Appellant's breach of the Agreement by paying out monies without obtaining the proper lien waivers. The trial court heard the evidence in this matter and awarded damages to Respondent for Appellant's clear breach of this Agreement. There is no mention in the Agreement of a provision which allowed discretion on Appellant's part in obtaining these lien waivers only for items that might be subject to a mechanic's lien suit. Appellant failed to produce a lien waiver in relation to the monies paid to General Electric. This was a breach of the Agreement and it matters not, under the clear wording of the Agreement, whether the items purchased from General Electric could have been subject to a mechanic's lien suit in the future. The trial court did not err in including the payment to General Electric in the award of damages.

■■■ Appellant also asserts under this point relied on that the trial court erred in including in its award "$26,715.38 for a payment to National Home Centers that National Home Centers' statement did not show was due."

At trial, Mr. Sawhill testified that while they were trying to resolve the outstanding claims he was notified by National Home Centers that it was owed $30,992.45 for doors and other hardware which were being stored at a National Home Centers warehouse and that if he did not pay the amount then due the items would be re-

7. We note in its argument under this point relied on, Appellant asserts that section 516.110(1) is inapplicable because Appellant promised to pay a third party on Respondent's behalf as opposed to promising to pay Respondent directly. Appellant cites no case law for this proposition and merely argues a negative inference by citing inapposite cases in which the statute was applied in debtor/creditor type situations. "If a party does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed abandoned." *Houston v. Weisman*, 197 S.W.3d 204, 206 (Mo.App. 2006). Accordingly, we shall not explore this argument here.

stocked at Respondent's expense. Mr. Sawhill contacted Mr. Babbitt and was told that Appellant did not have a lien waiver for this item or any other documentation relating to this disbursal. Mr. Sawhill related he paid National Home Centers and acquired the doors and hardware needed to finish the project.

On the other hand Appellant asserts that Mr. Sawhill's testimony was incorrect in that Respondent entered a document into evidence at trial which showed the items were re-stocked by National Home Centers and that the original $30,992.45 bill was reduced to $4,277.07. "The trial court is vested with the discretion to believe or disbelieve all, part, or none of any witness' testimony," *Foster v. Village of Brownington*, 140 S.W.3d 603, 607 (Mo.App.2004), " 'and to choose between conflicting evidence.' " *Capital One Bank v. Hardin*, 178 S.W.3d 565, 572 (Mo. App.2005) (quoting *In the Interest of A.H.*, 9 S.W.3d 56, 59 (Mo.App.2000)). It was within the trial court's province to believe the testimony of Mr. Sawhill and choose among conflicting evidence. *See id.* Further, " '[w]e must consider the evidence and all reasonable inferences in a light most favorable to the judgment, disregarding any evidence or inferences to the contrary.' " *Gaydos*, 245 S.W.3d at 306 (quoting *Pulley*, 197 S.W.3d at 165). Appellant has failed to prove the trial court's award of damages was not supported by the evidence. *See Murphy*, 536 S.W.2d at 32. Point denied.

The judgment of the trial court is affirmed.

BATES, J., and SCOTT, P.J., concur.

---

1. All statutory references are to RSMo (2000), unless otherwise indicated.